# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-454 (JEB)** |
| **v.** | : | |
| | : | |
| **Donald Pearston,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Donald Pearston to 30-days of incarceration for Count 3, 3-years' probation for Count 4, and order Pearston to pay $500 in restitution.

### I.    Introduction

The defendant, Pearston, a 58-year-old former United States Marine, who holds a Master's Degree and is a rental property landlord, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

On January 11, 2024, Pearston pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(D): Disorderly Conduct in a Capitol Building or Grounds, and one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 30-days incarceration and 3-years of probation is necessary because Pearston (1) defied police commands to leave; (2) entered the U.S. Capitol Building twice with other rioters through different

1

entry points; (3) minimized his conduct in an interview with the FBI; and (4) has yet to genuinely express sincere remorse for his criminal conduct on January 6.

The Court must also consider that Pearston's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Pearston's crimes support a sentence of 30-days of incarceration and 3-years of probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To minimize exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Dkt. Entry 22 (Statement of Offense), at 1-3.

### Pearston's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Pearston traveled from his home in Nebraska to Washington, D.C., to attend the "Stop the Steal" rally. On January 6, Pearston wore a black leather-like hooded jacket, a blue Nike shirt with the Nike Swoosh symbol, blue jeans, and a white mask. Pearston attended the "Stop the Steal" rally and then joined others who were rioting in and around the U.S. Capitol building.

At around 2:48 p.m., a line of DC Metropolitan Police Officers on the West side of the Capitol ordered Pearston and other rioters to "move back." As the officers moved forward and issued commands, Pearston acted disruptively by facing and making physical gestures towards the officers.

2



*Image 1: MPD BWC video showing rioters near the lower west terrace area at around 2:49 p.m.*

Pearston is knocked down as other rioters become physical with officers.[1]



*Image 2: MPD BWC video at approximately 2:49 p.m.*

---

[1] A clip from this altercation will be provided to the Court, separately, as Attachment 1.

Instead of exiting the area after that physical encounter, Pearston pressed forward with other rioters and continued towards the Senate Wing door.



*Image 3: MPD BWC video at approximately 2:55 p.m.*

Pearston then entered the U.S. Capitol Building, on the West side, through the Senate Wing Door at around 3:06 p.m. with other rioters.



*Image 4: USCP Security Footage from the Senate Wing Door*

After entering the building, Pearston proceeded into the crypt area at 3:09 p.m.



*Image 5: USCP Security Footage from the Crypt*

Pearston then walked down the hallway of the Memorial Door and House Wing Door at approximately 3:11 p.m., and through the Hall of Columns.



*Image 6: USCP Security Footage from House Wing Door*



*Image 7: USCP Security footage from Hall of Columns*

Pearston then exited the U.S. Capitol building at approximately 3:12 p.m.



*Image 8: USCP Security Footage from South Door*

After exiting the building, Pearston proceeded to the East Side of the U.S. Capitol Building and re-entered with dozens of other rioters, at around 3:21 p.m.



*Image 10: USCP Security Footage from East Rotunda Door Interior*

Pearston and other rioters stood before a line of officers at the interior east Rotunda door

at approximately 3:24 p.m.



*Image 11: USCP Security footage from East Rotunda Door Interior*

Pearston only left the Capitol, for the second time, when police officers forced him and the

other rioters out of the building at approximately 3:30 p.m.



*Image 12: USCP Security footage from East Rotunda Door*



*Image 13: USCP Security Footage from East Rotunda Door*

*Pearston's Interview Outside the East Rotunda Doors*

Pearston was interviewed outside the East Rotunda Doors by a third party after his second entry on January 6, 2021.[2] During this interview, Pearston discussed going into the U.S. Capitol building twice, getting into physical altercations with riot police, getting tear gassed, being a representative's office and seeing a person smoke a joint (which he described as "awesome"), and observing rocks being thrown. In describing his first exit from the building, Pearston stated, "They ran me out the back."

*Pearston's Interview with the FBI*

On December 15, 2021, Pearston voluntarily met with the FBI at his attorney's office in Eagle, Nebraska. During the interview, Pearston admitted to traveling to Washington, D.C., on January 5th to attend a Trump rally. Pearston stated he attended the rally on January 6 and then proceeded to the U.S. Capitol building after going back to his hotel. Pearston claimed that he walked onto Capitol grounds through open barricades and into the U.S. Capitol building through an open door. Pearston admitted to seeing police officers deploy pepper spray and then exited the building. Pearston then admitted he re-entered the U.S. Capitol building through an open door. Pearston then said police officers entered the room and ordered the crowd to exit the building. Pearston admitted to hearing the deployment of flash bang.

Pearston did not reveal his refusal to abide by police commands to move back while on Capitol grounds. Pearston also minimized the conduct of the riot by claiming he did not see anything unlawful occurring in the building.  And he did not explain why, after seeing police

---

[2] A short clip of the third-party interview will be provided to the Court, separately, as Attachment 2.

deploying pepper spray to clear the building of rioters, he nevertheless found a second entry point and breached the building once again, after that clear signal to leave.

*The Charges and Plea Agreement*

On September 13, 2023, the United States charged Donald Pearston by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 20, 2023, Pearston was arrested following his self-surrender to the FBI. On December 26, 2023, the United States charged Pearston with violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) in an Information. Pearston then pled guilty on January 11, 2024 to Counts 3 and 4 of the Information, charging him with Disorderly Conduct in a Capitol Building or Ground, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Pursuant to the plea agreement, Pearston agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Pearston faces sentencing on two Class B misdemeanor counts. As noted by the plea agreement and the U.S. Probation Office, Pearston faces up to six months of imprisonment and a fine of up to $5,000. Pearston must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Section 3553(a) identifies factors a court must consider in formulating a just and reasonable sentence for this case. As described below, the Section 3553(a) factors weigh in favor of 30-days of incarceration and 3 years of probation.

### A.  The Nature and Circumstances of the Offense

The nature and seriousness of the offense cannot be overstated. The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). In assessing Pearston's participation in the attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

For example, one of most important considerations is Pearston's disorderly conduct. Prior to entering the building with other rioters, at approximately 2:48 p.m., Pearston stood before a line of Metropolitan Police Officers who ordered rioters to move back. Instead of moving back, or leaving the area, Pearston refused the commands and faced the officers in an act of defiance. Pearston was knocked to the ground as rioters began to physically engage with officers.

Despite clear signs that police officers were attempting to remove the crowd from U.S. Capitol grounds, Pearston pressed forward and entered the U.S. Capitol building through the Senate Wing Door at 3:06 p.m. As Pearston admitted, he exited the building after police officers deployed pepper spray. Dkt. Entry 25 ¶ 18. Pearston's participation with others in breaching the building, and defiance of police commands are aggravating factors that favor increased punishment.

A second consideration is Pearston's second entry into the Capitol Building after being expelled. After being expelled from the Capitol building once by police who were forced to use pepper spray inside the historic building to remove the rioters, Pearston caused them to expend additional time and resources to remove him a second time, thereby taxing their ability to stop the

ongoing assault on the building. After exiting the building at around 3:12 p.m., Pearston walked around the building to the East Rotunda Door area and reentered the building at approximately 3:21 p.m.  This time, Pearston had to be physically expelled by police at 3:30 p.m.

Thereafter, Pearston recorded a video where he discussed without regret going into the building twice, getting into a physical altercation with police, seeing another person smoke a joint in a congressman's office (which he described as, "awesome"), and seeing rocks being thrown. Dkt. Entry 25 ¶ 18. These statements demonstrate Pearston was aware he and the other rioters were engaged in wrongful conduct and that he openly participated in the chaos.

The final aggravating factor is Pearston's minimization of his conduct to the FBI on December 15, 2021. Pearston failed to disclose his refusal to leave the area when ordered to do so by a line of D.C. Metropolitan Police officers and failed to disclose the physical engagements between rioters and officers that he observed when he was knocked down. Pearston also minimized the wrongful conduct on January 6 by claiming he did not see any other crimes being committed while inside the building.

Each of these factors support a sentence of incarceration.

**B.  Pearston's History and Characteristics**

As set forth in the PSR, Pearston is well-educated, married, and financially stable. Until January 6, he had no criminal history. Dkt. Entry 25 ¶ 7.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a higher sentence, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think

anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (Statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

Two factors indicate that there is a need for specific deterrence in Pearston's case: (1) open defiance of police commands and repeat entries into the building; and (2) his minimizing statements to the FBI. These facts weigh in favor of a sentence that will specifically deter Pearston from engaging in future misconduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, like this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Pearston based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Pearston has pleaded guilty to two Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (Statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (Statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (Statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (Statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed on similarly situated defendants.

Other similarly situated defendants include:

• *United States v. Louis Valentin*, 21-CR-702 (JEB). Valentin entered the Capitol Building through the Upper West Terrace Door, seeing signs that read "Emergency Exit" and hearing the security alarm. Valentin climbed the steps to the Rotunda and walked around the building for approximately 10 minutes. Valentin stayed in the Rotunda area for over 30 minutes and watched rioters violently confront police. During an interview with the FBI, Valentin also minimized his conduct by claiming to not see violence in the Rotunda and to not know it was unlawful to enter the Capitol building. Valentin pled guilty to violating Section 5104(e)(2)(g) (Parading) and received 10 days of intermittent confinement and 12 months of probation by this Court.

• *United States v. Dominick Madden*, 21-cr-055 (JEB). Madden was one of the first rioters to breach the police line at the Lower West Terrace and encouraged others to go forward. Madden breached the line despite observing multiple assaults on police. When Madden returned

home from January 6, he tried to destroy evidence (i.e. attempting to throw out clothing worn on January 6 and replacing his cell phone). Madden pled guilty to violating Section 5104(e)(2)(G) (Parading) and this Court sentenced Madden to 20-days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[4] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pearston must pay $500 in restitution to the Architect of the Capitol, which reflects in part the role Pearston played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol caused millions in damages in damages. *Id.* Pearston's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 67.

///

///

///

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends this Court sentence Donald Pearston to 30-days of imprisonment for Count 3, 3-years of probation for Count 4, and order $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney


By:     _/s/Raymond K. Woo_
RAYMOND K. WOO
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
Raymond.woo@usdoj.gov
(602) 514-7736
AZ Bar No. 023050